UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:19-CR-30-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | OPINION AND ORDER |
| JORDAN P. MOORE, | ) | |
| | ) | |
| Defendant. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

This case turns on the applicability of a well-known exception to the Fourth Amendment warrant requirement: the inventory search. Here, Berea police searched Defendant Moore's car without a warrant. The Constitution requires a warrant, as the default rule. The Government must justify any exception.

After careful review, the Court finds that the United States failed to sustain the warrantless search for two basic reasons. First, the involved officer searched with a predominately investigative purpose. Second, and relatedly, the officer did not actually perform an inventory search—he so violated Berea policy that the Court finds him not to have conducted a search within the exception's contours. Sixth Circuit precedent thus invalidates the conduct. The Court **GRANTS** DE 62, rejects DE 77 on the terms here stated, and directs suppression of the evidence improperly seized.

I.   BACKGROUND

Judge Ingram's recommended disposition sets out the full narrative. *See* DE 77 at 1–5. By way of summary, on May 16, 2019,[1] Officer William Johnson of the Berea Police Department

---

[1] On May 3, Johnson stopped the same car for the same reason. Moore was not involved that day.

1

conducted a traffic stop, for cancelled registration, on a car driven by Defendant. The stop occurred in the parking lot of the America's Best Value Inn in Berea. After Johnson asked Moore to produce her identification, registration, and proof of insurance, he learned that Defendant's boyfriend's sister owned the car and that Defendant's permit was suspended, meaning that she could not legally drive. Johnson denied Defendant's request to call her boyfriend, who was observing the stop from the motel balcony. Johnson promptly arrested Defendant on the suspended-permit offense and called a tow truck.

Around this same time, Johnson observed two people run from the motel into a wooded area, which prompted Johnson to call for backup. Johnson also requested a K-9 unit while he awaited the tow truck. Johnson later testified at the suppression hearing that he believed the unidentified individuals to have warrants or to be involved in drug activity and that he usually requests K-9 units during traffic stops. The K-9 was not available. On the scene, when an additional officer responded, Johnson voiced his suspicions; there was a truck in the motel parking lot that Johnson associated with Gary Mullins (who had an active warrant), and Johnson identified the motel room where he had seen Moore's boyfriend and suspected Mullins to be hiding. Johnson instructed the other officer that he should consider entering the room to execute the warrant. Johnson further advised his colleague that he was going to inventory the car driven by Defendant because "that's the only way I'm gonna be able to search this car."

Johnson then returned to the car, from which he had removed Defendant. Per Department policy, whenever a vehicle is to be towed, officers must complete an inventory search to "report any items of value that are within the vehicle." *See* DE 66-2 at 3. With Defendant handcuffed in Johnson's vehicle, Johnson searched some of the passenger compartment. Inside, Johnson immediately searched a purse—later claimed by Defendant—which revealed suspected (and

2

eventually confirmed) controlled substances. After discovering the contraband, Johnson failed to inventory or even open the glove box and trunk, in violation of Department policy. His review of the cabin was cursory, at least as to a search for items of value. The tow sheet completed on scene reflects a few generic items found within the car, including a pizza and, literally, "various items." *See* DE 70 (Exhibit 5, BPD Motor Vehicle Impoundment & Inventory Record). Footage from Johnson's body camera confirms the full sequence of events. *See* DE 70 (Exhibit 4, CD Disc (marked: Moore2019!) Body Cam Recording).

\* \* \* \* \*

Defendant asks the Court to suppress the evidence recovered from her purse. DE 62. The United States opposes. DE 66. On referral, Judge Ingram held an evidentiary hearing on October 11, 2019, *see* DE 71 (Minutes), after which both Defendant and the United States submitted additional briefing, *see* DE 74; DE 75. Judge Ingram recommended denial after finding that Johnson's noncompliance with policy did not amount to a constitutional violation and that evidence of Johnson's investigatory motive did not invalidate the proper inventory basis. *See* DE 77 at 10. Defendant timely objected, contending both that the "inventory" was a ruse to comb the car and that the policy violations queered the search. *See* DE 78 at 2–3.

## II. STANDARD

"A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court must review *de novo* any "portions of the report or specified proposed findings" to which any party objects. *Id.* However, the Court is not required to "review . . . a magistrate[] [judge]'s factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."

3

*Thomas v. Arn*, 106 S. Ct. 466, 472 (1985). The objections fairly place the briefed issues in play for *de novo* evaluation. The Court has canvassed the pertinent matters.

### III.　ANALYSIS

#### A.　Stop and Arrest

Defendant first objects to the basis for her arrest. *See* DE 78 at 2–3, ¶¶ 1–3. She notes that Johnson could have opted not to arrest her on the suspended-permit offense and suggests that, by needlessly arresting Defendant, Johnson manufactured the opportunity for an inventory search. *See id.* Judge Ingram found that Defendant could not legally drive (without a valid credential) and that the car could not operate lawfully for lack of valid registration. *See* DE 77 at 7. For the reasons below, Johnson's constitutionally adequate grounds to stop and then arrest Defendant are beyond reasonable dispute.

"Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 116 S. Ct. 1769, 1774 (1996). "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). Additionally, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 121 S. Ct. 1536, 1557 (2001). In *Atwater*, the Supreme Court upheld a warrantless arrest for "a misdemeanor seatbelt violation punishable only by a fine." *See id.* at 1541.

Here, Johnson validly stopped Defendant for cancelled registration and arrested her for operating a vehicle without a license. As Moore acknowledges, *see* DE 78 at 13 n.2, the latter offense is an arrestable Class B misdemeanor under Kentucky law. *See* KRS 186.620(2); KRS

4

186.990(3) (providing penalty); KRS 431.005(1)(d) (authorizing peace officers to make warrantless arrests for misdemeanors committed in their presence). Johnson's subjective motivation[2] is irrelevant to the probable cause calculus. *See Whren*, 116 S. Ct. at 1774. Defendant highlights that this offense "does not require an arrest." *See* DE 78 at 2, ¶ 1. True enough, but the Fourth Amendment certainly permits one. *See Atwater*, 121 S. Ct. at 1557.

### B. Tow

Defendant next challenges Johnson's decision to impound the car. *See* DE 78 at 3, ¶ 3. She points out that, early on during the stop, prior to her arrest, Johnson denied Defendant's request to call her nearby boyfriend. *See id.* at 13–14. Moore argues that this call could have obviated the need for a tow truck and that Johnson's denial further suggests that he contrived an unnecessary inventory search. *See id.*

Officer discretion on impoundment is permissible "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *See Colorado v. Bertine*, 107 S. Ct. 738, 743 (1987). "Whether a police department maintains a written policy is not determinative, where testimony establishes the existence and contours of the policy." *United States v. Tackett*, 486 F.3d 230, 233 (6th Cir. 2007).

Here, the Department policy in the record does not dictate when officers should call a tow truck or what actions they should take, if any, as alternatives to impoundment. Johnson did not

---

[2] Defendant also challenges Johnson's testimony that the arrest was consistent with his standard practice. *See* DE 73 at 37 ("I usually arrest on suspended. I've done that my whole career."); DE 78 at 3, ¶ 2. According to his suppression hearing testimony, Johnson had stopped the same vehicle two weeks prior to the stop at issue. *See* DE 73 at 7–9. During the earlier stop, Johnson cited the driver for cancelled registration and drug offenses. *See id.* On this previous occasion, Johnson warned the driver but did not arrest her. *See id.* at 12. Johnson's inconsistent exercise of discretion is not constitutionally significant but may call his credibility into question. On the other hand, a persistent failure to register may have contributed to Johnson's disposition.

5

testify about an unwritten impoundment policy. But, Defendant does not object on this basis other than to claim that her arrest was unnecessary and pretextual (which the Court rejects for the reasons above). Given the lack of objection, the Court considers whether impoundment was reasonable under the circumstances.

To decide whether impoundment was appropriate, there need not be "a determination of whether there was in fact a *need* . . . to impound the [vehicle]; instead we are required to determine whether the. . . decision to impound was *reasonable* under the circumstances." *Collins v. Nagle*, 892 F.2d 489, 493–94 (6th Cir. 1989) (emphasis added). The decision to impound must be objectively justifiable and does not account for an officer's subjective intent. *See United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001). "[A]n impoundment decision will not be impermissible simply because alternatives to impoundment might exist." *United States v. Hockenberry*, 730 F.3d 645, 658–59 (6th Cir. 2013). For example, the Sixth Circuit has nixed the argument that, prior to impoundment, officers must contact someone to take possession of the car. *See United States v. Jackson*, 682 F.3d 448, 454–55 (6th Cir. 2012); *Kimes*, 246 F.3d at 804–05. On the other hand, in *United States v. Graham*, No. 14-20135-STA-tmp, 2015 WL 4078299 (W.D. Tenn. July 6, 2015), the decision to impound was unreasonable when the defendant's car was illegally parked on a residential street close to his own driveway and when his family members showed up within minutes of arrest. *Id.* at *13. *Graham* further noted that the officers evinced investigatory purposes before they made the impoundment decision. *See id.*

Here, despite the apparent lack of impoundment policy, Johnson's tow decision was reasonable. Johnson called for a tow truck immediately upon learning that Defendant had a suspended permit and could not legally drive. Additionally, there was no alternate driver on the scene, and in any event the unregistered car could not be operated legally. *See* KRS 186.170. As

Judge Ingram observed, Johnson was not constitutionally required to pursue alternatives to impoundment. *See* DE 77 at 7–8 (citing *Jackson*, 682 F.3d at 454). Johnson could have made other arrangements or allowed Defendant to do so, but he need not have. *See Hockenberry*, 730 F.3d at 658–59 (noting that the Fourth Amendment does not require officers to call an arrestee's spouse or to allow an arrestee to avoid impoundment by calling someone). The circumstances here are unlike *Graham*. *See Graham*, 2015 WL 4078299, at *12–13.

### C. Inventory

With respect to the search itself, Defendant criticizes the invalid scope and maintains that the inventory justification was merely a ruse. *See* DE 78 at 13–14. As proof of pretext, Defendant points to Johnson's comment to his colleague on the scene—noting, after the K9 officers were unavailable and after Johnson had already called for a tow truck, that an inventory search was "the only way" that Johnson would be able to search the car. *See id.* at 3, ¶ 4. Johnson's methods cast additional doubt on the inventory justification because the process was both under- and over-inclusive; Johnson searched Defendant's purse, although he ultimately removed the purse from the car (rather than allowing it to go with the towed car like the other items inventoried),[3] and he failed to search the glove box or trunk, look inside pockets of clothing, or open "other closed items" inside the car. *See id.* at 3–4, ¶¶ 5–7. Johnson also shook soda cans but failed to count the currency in Defendant's purse. *See id.* at 9–10. The search, caught on video, allows direct assessment of the extent, intensity, and consistency of Johnson's conduct.

---

[3] There is a lingering, though not determinative, question whether Johnson erroneously included Defendant's purse on the inventory search record or whether there was another unidentified "white bag with numerous items" in the car. *See* DE 77 at 4, 8; DE 78 at 8 ("[T]he inventory search record was so deficient that it listed the purse of the defendant which was given back to her."). The Court finds the purse not listed; the inventory sheet references a different white bag. The video and testimony support this finding.

7

The Fourth Amendment prohibits unreasonable searches. U.S. Const. amend. IV. Warrantless searches are generally unreasonable. *Brigham City v. Stuart*, 126 S. Ct. 1943, 1947 (2006). A proponent of a warrantless search bears the burden to show that an exception to the warrant requirement applies. *United States v. Jeffers*, 72 S. Ct. 93, 95 (1951). Inventory searches are one such exception. *Bertine*, 107 S. Ct. at 741. Neither probable cause nor a warrant is required to conduct a valid inventory. *South Dakota v. Opperman*, 96 S. Ct. 3092, 3097 n.5 (1976). By definition, an inventory is a "routine, non-criminal procedure[]" within one of the police's "caretaking functions." *Id.* at 3097. "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Whren*, 116 S. Ct. at 1773 n.1.

In general, when there is some measurable quantum of suspicion (like probable cause), an officer's subjective motivation cannot "invalidate[] objectively justifiable behavior under the Fourth Amendment." *See id.* at 1174 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). However, because an inventory search does not require probable cause or indeed any individualized suspicion, the proper analysis accounts for subjectivity (at least to some extent) and "involves a balancing of all relevant factors." *See id.* at 1176. *But see Kimes*, 246 F.3d at 805 ("The Fourth Amendment permits impoundment decisions

and *inventory searches* that are objectively justifiable, moreover, *regardless of an officer's subjective intent*.") (citing *Whren*) (emphasis added).[4]

Officers conducting an inventory may not act "in bad faith or for the sole purpose of investigation." *See Bertine*, 107 S. Ct. at 741–42. Per *United States v. Smith*, 510 F.3d 641 (6th Cir. 2007), "[i]n order to be deemed valid, an inventory search may not be undertaken 'for purposes of investigation,' and it must be conducted 'according to standard police procedures.'" *Id.* at 651 (internal quotation omitted); *see also United States v. Rowland*, 341 F.3d 774, 779–82 (8th Cir. 2003) (finding no inventory exception when officers' failure to properly record car's contents violated official policy and evinced investigatory motive). To the extent *Kimes* suggests officer motivation is irrelevant in the inventory search context, the suggestion conflicts with Supreme Court cases since *Opperman*, to include *Wells*, *Whren*, and *Bertine*. Further, later Sixth Circuit cases, including *Jackson* as recently as 2012, have continued to include officer motivation as a central part of warrant-exception scrutiny in the context of an inventory search.

The Sixth Circuit requires an inquiry into purpose and a review of policy compliance, and a full ruse or significant policy breach renders the exception inapplicable. Some tenets: "[T]he exemption from the need for probable cause (and warrant), which is accorded to searches made

---

[4] There is a troubling tension between the typical, objective probable cause inquiry and one that accounts for subjectivity. *Whren* both generally foreclosed consideration of pretext and suggested an exception for inventory searches and like activities. *See Whren*, 116 S. Ct. at 1176–77. Courts in other Circuits have struggled to define the bounds of the inquiry into subjective intent. *See United States v. Orozco*, 858 F.3d 1204, 1212–13 (9th Cir. 2017) (both accounting for an officer's subjective intent and emphasizing that "the presence of a criminal investigatory motive, by itself, does not render an administrative stop pretextual"); *United States v. Johnson*, 889 F.3d 1120, 1129–30 (9th Cir. 2018) (O'Scannlain, J., specially concurring) (questioning *Orozco* and contending that "an individual officer's 'subjective motivation is irrelevant' to the Fourth Amendment, even when the programmatic motivation behind an administrative inspection scheme might matter") (quoting *Brigham City*, 126 S. Ct. at 1948). Ultimately, the Court will do its best to respect the Sixth Circuit demarcation, which does expressly require a sounding of purpose in assessing inventory search propriety.

for the purpose of inventory or administrative regulation, is not accorded to searches that are not made for those purposes." *Whren*, 116 S. Ct. at 1173. "[T]hat standardized criteria . . . or established routine . . . must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 110 S. Ct. 1632, 1635 (1990) (internal citation omitted). "However, the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." *Smith*, 510 F.3d at 651. Additionally, "the law allows for some flexibility and practical judgment in how such searches are carried out." *Hockenberry*, 730 F.3d at 661. "As to the comprehensiveness of the inventory list, an officer's use of discretion in implementing agency guidelines regarding the conduct of an inventory search does not necessarily violate the Fourth Amendment." *Kimes*, 246 F.3d at 805. Here, the evidence—including body camera audio and video recordings—shows that Johnson had immediate, significant investigative motivation. He questioned Defendant about her boyfriend and admittedly thought that drug activity ("dope") was present, both in the associated motel room and possibly on the persons of those fleeing the area. Johnson also believed that the nearby motel parking lot held a vehicle used by Mullins, who had an active warrant. Johnson called for a K-9 unit right away, despite denying any suspicion against Moore at the time.

Ultimately, the K-9 unit was unavailable. Johnson encouraged another officer to pursue entry into the motel room, on dubious constitutional grounds,[5] and then announced that he was

---

[5] Meaning this: Johnson saw a car he associated with Mullins, but he did not see Mullins. He linked Mullins to the inn room behind where Moore's boyfriend stood. To Johnson, this all potentially warranted entry to execute an arrest warrant on Mullins, and he so advised his colleague. These matters are not directly at issue, but the Court finds the aggressive entry analysis here, with highly doubtful cause, telling. *See Payton v. New York*, 100 S. Ct. 1371, 1388 (1980) ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within*.") (emphasis added).

10

going to search the car ("I'm gonna do an inventory search, that's the only way I'm gonna be able to search this car.").

This shows—in terms and tone—an overriding investigative purpose. When Johnson realizes that he will not get K-9 involvement, *see* DE 73 at 29–30, 53–54, he turns to the inventory search as the "only way" he can search, sort of the last search tool in his belt. Search was Johnson's stated goal and purpose in the context of the unfolding scene. He viewed an inventory as a means, not a neutral, administrative end.

The Government might say Johnson had more than one purpose. He did call for the tow from the jump,[6] and the policy, if followed, would require the inventory regardless. Some cases talk about having an investigative purpose, while some talk about having a "sole" investigative purpose, harkening back to *Bertine*. The Court finds that Johnson's overriding purpose, by the time of the actual search, was to investigate, and the search manner reinforces that conclusion. However, he certainly formed the intent to tow in a valid way, and that dilutes the purpose finding somewhat, calling into question the singular nature of Johnson's motivation. *See Johnson*, 889 F.3d at 1126 ("[T]he mere 'presence of a criminal investigatory motive' or a 'dual motive—one valid, and one impermissible—' does not render an administrative stop or search invalid; instead, we ask whether the challenged search or seizure 'would . . . have occurred in the absence of an impermissible reason.'") (quoting *Orozco*, 858 F.3d at 1212–13). No matter, because Johnson ultimately did not perform a valid inventory search.

The search itself flouted Department policy in several critical ways and was internally inconsistent. First, Johnson failed to search the car's glove box or trunk. This decision contravenes

---

[6] As soon as Johnson confirmed Moore's license status, he radioed for the tow. That was immediately prior to arrest. *See* DE 70 (Exhibit 4, CD Disc (marked: Moore2019!) Body Cam Recording).

11

policy and does not bear any reasonable justification; those areas may undoubtedly conceal valuable items that ought to be inventoried. Second, Johnson searched Defendant's purse in exacting detail, but his subsequent perusal of the car's contents was cursory at best. Third, his approach to containers was inconsistent and violative of policy. Defendant's purse was a container properly subject to inventory, but Johnson—without adequate explanation—did not open numerous other containers in the car (including several bags). Finally, the tow sheet is both incomplete and, in the Court's view, absurd. The purpose of an inventory is to identify and catalog items "of value," so Johnson's inclusion of "Little Caesar's Pizza" and "crazy bread" is stultifying and non-serious. Listing perishable pizza while not even opening key areas of the car shows that this was not a bona fide endeavor to inventory the car's contents.

Johnson himself admitted that he defined the search principally by the contraband he found. *See* DE 73 at 46 ("I located the drugs in the front seat in her bag, and that's it."). Thus, he began with Defendant's purse, and upon locating suspected contraband, he essentially considered the inventory search concluded. Illogically, because he found suspicious items in the purse, he assumed the car would hold no other valuable items. Johnson attempts to explain his elided search in that way, but a proper inventory search proceeds per the governing policy with the intent of producing a valid inventory. Under cross-examination, Johnson expressly claimed that because he had searched the purse, he had exhausted all items of value in the full car. *See* DE 73 at 32 (as to why he did not open the trunk: "Just didn't. I had everything that I located in the bag. I felt like that that was all that was there."). He also ignored the search of areas or items he could not attribute to or associate with the female driver. *See id.* at 46 ("Didn't look like any of the clothes belonged to her"). This all signifies that Johnson viewed the search as particular to Moore and to his developed suspicions regarding her. Johnson was not realistically attempting to capture the

12

contents of the vehicle; his search was purposeful to her, not neutral and administrative, and was starkly out of step with Berea PD policy. The Officer took the time to pick up and rattle drink cans because "[y]ou would be surprised what people hide." *See id.* at 62. He did not, directly counter to the established criteria, take the time to look in the trunk, open other bags in the car, or open the glove compartment. Under even the most flexible approach, this was not an inventory as defined and governed by Department policy.

Johnson's noncompliance with policy was so complete that the Court is unable to call the act an inventory search. This is so despite full awareness that the Court should not take a rigid or mechanical approach. *See Hockenberry*, 730 F.3d at 661 ("[T]he law allows for some flexibility and practical judgment in how such searches are carried out.").

A search with investigative purpose expressly violates the policy. *See* DE 66-2 at 3 ("An inventory search is not a search for evidence or contraband and is not a search with an investigative purpose."). A search of only part of a car violates the policy. *See id.* A search that opens only some containers violates the policy. *See id.* A search that does not produce a listing of all items of value violates the policy. *See id.* An officer that uses the policy to gain access to a car and purse but then flouts the same policy may not stand under the policy's umbrella. This strikes the Court as unreasonable conduct, the ultimate touchstone of the Fourth Amendment.

The government bears the burden to show a valid inventory search, meaning a search properly purposed and conducted in accordance with a neutral, canalized policy. *Smith* stakes validity on search purpose and policy compliance. *See also Jackson*, 682 F.3d at 455. Here, the policy itself was fine. The officer used the process improperly and unreasonably ignored most of its important strictures. A warrant is the rule, and the government must prove an exception. The

United States has not met that burden. As such, the Court deems the search invalid and the seized evidence subject to suppression.

## IV. CONCLUSION

Accordingly, the Court **ORDERS** as follows:

1. The Court **REJECTS** the R&R (DE 77) per the analysis outlined in this Opinion;

2. The Court **GRANTS** DE 62; and

3. Consistent with prior findings (DE 65), the Court **SCHEDULES** a jury trial in this matter for **April 6, 2020**, at 9:00 a.m. in London, Kentucky.[7] Counsel shall appear by 8:30 a.m. All unexpired pretrial deadlines (DE 29; DE 40; DE 56) reset relative to this trial date.

This the 18th day of February, 2020.

Signed By:
_Robert E. Wier_
United States District Judge

---

[7] The STA analysis begins with Co-Defendant Hurley's initial appearance and arraignment on August 1, 2019. *See* DE 55. Twenty non-excludable days elapsed before Moore filed her suppression motion. *See* DE 62. As of the date of this Order, fifty days remain on the STA clock.

14